# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | NO. 1:09-CV-3371-JEC |
| | : | |
| $5,282,495.03 SEIZED FROM | : | |
| FIDELITY BANK ACCOUNT | : | |
| X-0691; and $1,100,957.44 SEIZED | : | |
| FROM FIDELITY BANK | : | |
| ACCOUNT X-078 | : | |
| | : | |
| Defendants. | : | |

---

## JOINT MOTION FOR PROTECTIVE ORDER BY CLAIMANTS MANSEF INC. AND PREMIUM SERVICES LLC

COME NOW Claimants, Mansef Inc. ("Mansef") and Premium

Services, LLC ("Premium") (jointly "Claimants"), by and through

undersigned counsel, and hereby file this Joint Motion For Protective Order

pursuant to Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure in

order to protect the disclosure of information that Claimants deem

confidential and/or proprietary as well as information the disclosure of

which could violate European Union and American privacy laws.  Claimants

therefore respectfully request the Court enter the Protective Order attached

herewith as Exhibit A.  In support thereof, undersigned counsel submit the

following Memorandum of Law, as well as the certifications and Declaration

of Susan Kohn Ross, Counsel for Claimant Mansef.

## MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PROTECTIVE ORDER BY CLAIMANTS MANSEF INC. AND PREMIUM SERVICES LLC

## I. INTRODUCTION

This is an action involving the Government's seizure of funds held in

bank accounts followed by a forfeiture complaint based solely on the

allegation that Claimant Premium is an unlicensed money transmitting

business and so was required to be registered either with the Financial

Crimes Enforcement Network ("FinCEN") and/or the State of Georgia.  The

position of Claimants is that Premium is not a money transmitting business

as defined in federal or Georgia state law and is consequently not required to

be registered as such with the federal government or be registered or

licensed as such with the State of Georgia.

On October 9, 2009, agents of the United States Secret Service

arrested some $6+ million in two bank accounts held by Premium at the

direction and on behalf of Mansef.  Between December 2009 and January

2010, Claimants presented nearly 500 pages of exhibits, much of it at an in

person meeting, along with a smaller portion that was later posted to the

Government.

The Government has since served Interrogatories and Requests for Production of Documents upon Claimants calling for the disclosure of highly sensitive and confidential business data as well as information which contains the identity and other private information about individuals who are subscribers to Claimants' internet services. Claimants are willing to produce the relevant requested information to the Government upon entry of a protective order that adequately assures Claimants the information they will produce will not be publicly available or disseminated to non-law enforcement third parties, and further that disclosure of the information will not violate American or European Union privacy laws.

The Government does not deny the need for a Protective Order in this case. In fact, the parties have been negotiating for nearly three and a half months to come to agreement as to the terms of such an Order, but without success to date. [1] The parties' main disagreement centers around with whom

---

[1] Pursuant to Fed. R. Civ. P. 26(c), and as set forth in the accompanying certification, Claimants first sent the Government a proposed Protective Order on or about March 30, 2010. The Government did not respond until on or about May 7, 2010, and then only after repeated prodding. Claimants then provided a revised version on or about June 23, 2010, which incorporated several of the Government's proposed changes. The

the confidential discovery may be shared.  In addition, Claimants seek

protections within the Order that they may produce the requested

information in a manner that will not subject them to liability for violation of

European privacy laws.  Counsel for Claimants continue to be willing to

discuss the proposed Orders, and are in the process of attempting to arrange

a telephone conference with the Government to reach an agreement.

However, because three and a half months of negotiation have proven

fruitless, in conjunction with the imminent due dates for responses to

discovery propounded by the Government, Claimants are unable to continue

negotiations in this manner.  In addition, Claimants continue to be damaged

by the interruption of business operations and inability to access the

significant funds seized by the Government.  In consequence, and to

contribute to the expedient resolution of this case by aiding the completion

of the discovery process, Claimants have filed this Motion.

As soon as this Motion for Protective Order is on file, it is Claimants'

intention to respond to all discovery propounded, designating appropriate

material as confidential and redacting certain details.  Claimants also remain

---

Government then waited until July 8, 2010 to respond to that revised
version, again only after repeated inquiry by Claimants.

hopeful they can work out terms for a Protective Order even after this

Motion is on file.

## II.  THE GOVERNMENT'S DISCOVERY REQUESTS CONCERN HIGHLY SENSITIVE PROPRIETARY BUSINESS INFORMATION

On May 14, 2010, the Government served Requests for Production of

Documents on Claimants.  Interrogatories were served on Claimants on June

14, 2010.  The response dates are July 16th and 19th, 2010, respectively.

These discovery requests overwhelmingly call for the production of

confidential, highly sensitive information, much of which is irrelevant to the

Government's current case.  Both Claimants are privately held companies,

one located in Canada (Mansef), and one located in the United States

(Premium).  For purposes of this litigation, Premium serves as Mansef's

fiscal agent.

The nature of the information requested of Claimants falls into two

general categories:  (a) information regarding how the Claimants structure

and run their business; and (b) information regarding the financial affairs of

the business.  Claimants have been asked to divulge information about their

internal organization and corporate structure, how they elect to satisfy their

banking and financial needs, their relationships with affiliates and

subsidiaries, their profit margins, marketing tactics, rates charged to clients,

wages paid to employees, relationships with fiscal agents, and revenue

sources and customers' identities.  For example, in Request No. 13, the

Government inquires into company financial data and customer-identifying

information, asking for:

> Any and all documents that reflect the source of all money,
> whether in paper, coin, wires or other electronic form, that
> Mansef, Inc. has received since January 1, 2008, including but
> not limited to documents that show the date the money was
> received, the amount that was received, the person or company
> that made the payment, the reason Mansef, Inc. received the
> money, billing records, financial statements, financial reports,
> cash receipts, cash or sales printouts, invoices, contracts,
> correspondence and internal memoranda regarding financial
> data or reports, monetary log books, accounting records, and
> any other documents that reflect the source of any money that
> Mansef, Inc. received during the period.

Request No. 21 queries the inspection of marketing decisions, asking

Claimants to:

> Produce all documents that refer or relate to the marketing and
> promotion of any website owned, leased, operated, managed, or
> hosted by Mansef, Inc. during the period January 1, 2008,
> through the present, including but not limited to documents that
> provide the name and address of medium (such as website,
> newspaper, magazine, etc.) upon or in which such marketing
> and promotion occurred, the website marketed or promoted, and
> the rates charged to Mansef, Inc. for the marketing or
> promotion service.

Request No. 22 similarly implicates Claimants' private business strategies asking for:

> All documents, including correspondence and memoranda, that in any way relate to solicitation of business by any website under your control or management since January 1, 2008.

The Interrogatories propounded by the Government raise the same sorts of confidential business information and privacy issues.  In the First Set of Special Interrogatories, Interrogatory No. 4., the Government seeks to explore Mansef's relationship with its fiscal agent, asking Mansef to:

> Detail any and all services provided by Premium Services.

The Government's First Set of Interrogatories involve information that is equally confidential and sensitive, such as customer information and identity.  For example, Plaintiff's First Set of Interrogatories, Interrogatory No. 4, asks Mansef:

> For each of the incoming wire transfers and ACH deposits that were made into Fidelity Account X-0691 (as listed on Exhibit A attached to the Plaintiff's Complaint for Forfeiture in this case), please provide specific details on how Mansef, Inc. and/or Premium Services, LLC gained possession of each incoming wire or deposit, including within your response the name and URL of the website from which purchases were made

to generate the funds wired, the goods or services sold in order
to obtain the funds, and provide the name and address of each
person or entity that may have knowledge of the wires.

In Interrogatory No. 11, the Government seeks to investigate Mansef's profit

margins, supplier and customer rates, and investment decisions, asking that

Mansef:

> Give a detailed listing of each and every website that Mansef,
> Inc., any corporation created by Mansef, Inc., or a corporation
> owned or controlled by any Mansef, Inc., member, officer or
> employee, has created, owned, leased, operated, managed,
> hosted, controlled, purchased, sold, or had any interest in
> during the period January 1, 2007, through the present,
> including in your response the name of the website, Mansef,
> Inc.'s relationship to the website, a detailed description of the
> content on the website, whether the website was in operation
> during the relevant time period, here the content of the
> website was obtained, the amount paid for the website's
> content, the services sold or provided on the website, the rates
> charged to clients, the overall amount of money generated
> from the website, how clients made payments to the website,
> how Mansef, Inc., collected the revenue generated by the
> website, and how the revenue was disbursed.

The Interrogatories also probe into Mansef's private business decisions

involving its relationships with its agents, thus implicating its methods for

maximizing profit and securing a competitive edge, with Interrogatory No.

12 demanding:

> Please explain why Mansef, Inc., needed a separate fiscal agent
> to handle business-generated income and include in your
> response a list of all other companies, partnerships or other

entities that Mansef, Inc., has used as a fiscal agent since
January 1, 2005.

Similar demands and inquires are made of Premium.

## III. THE GOVERNMENT'S DISCOVERY REQUESTS INVOLVE PRIVATE, PERSONALLY-IDENTIFYING INFORMATION ABOUT EUROPEAN CUSTOMERS

To the extent Claimants' users are located in the U.S., their privacy is

protected through a variety of sources, including the 4th and 5th

Amendments to the U.S. Constitution. However, many of Mansef's users

are located in other countries, especially Europe. Therefore, in addition to

the proprietary nature of the information requested by the Government

through its propounded discovery, some of the requests and interrogatories

also involve private information about those European customers.

Disclosure of this information could conflict with the Directive 95/46/EC of

the European Parliament and of the Council on the Protection of Individuals

with Regard to the Processing of Personal Data and on the Free Movement

of Such Data ("European Data Privacy Directive," or "Directive 95/46/EC"),

as well as related and similar European national privacy protection laws.

For example, in Request for Production of Documents No. 12, the

Government asks for the identity of customers who made payments to

Mansef, and for information that could implicate those customers' own

private financial information, such as names of the individuals, addresses

and credit card numbers which may appear on the Claimants' credit card

processor statements. Specifically, Request No. 12 requires Mansef to

supply:

> All documents that reflect or relate in any way to income
> earned or received by Mansef, Inc. and/or Premium Services,
> LLC since January 1, 2008, including but not limited to
> documents that show the date the income was received, the
> amount that was received, the payee or the source of the
> income, the reason the income was paid to Mansef, Inc. or
> Premium Services, LLC, billing records, financial statements,
> accounts receivable, journal entries, financial reports, cash
> receipts, cash or sales printouts, invoices, contracts,
> correspondence and internal memoranda regarding financial
> data or reports, monetary log books, accounting records, and
> any other documents that reflect any income earned by Mansef,
> Inc.

Likewise, Request No. 13, as cited above, asks for similar information

that may involve divulging personally-identifying information about

Claimants' customers. By way of further example, Request No. 20 may also

involve revealing private information about European individuals, as it asks

that Mansef:

> Produce any and all documents that identify each and every
> website owned, leased, operated, managed, or hosted by
> Mansef, Inc., in operation during the period January 1, 2008
> through the present, including but not limited to documents that
> provide the website name, URL, the identity of the person or

entity that established or set-up the website, type of business, services offered or sold, the rates charged to clients, the overall amount of money generated from the website during the above time period, and payment records showing the amounts of money generated from the website on a monthly basis during the above time period.

Again, similar demands and inquiries are made of Premium.

## IV. LEGAL ARGUMENTS SUPPORTING ENTRY OF PROTECTIVE ORDER

### A. Standard of Entry for a Protective Order

A trial court may issue a protective order upon a showing of good cause. Fed. R. Civ. P. 26(c) (stating that for good cause shown, the court may make any order which justice requires to "protect a party or a person from annoyance, embarrassment, oppression, or undue burden."). The Federal Rules specifically authorize the entry of a protective order to prohibit the disclosure, or designate the manner of disclosure of a "trade secret or other confidential research, development, or commercial information." Fed. R. Civ. P. 26(c)(1)(G).

The prerequisite for entering a protective order is a showing of good cause by the party seeking the protection. Chicago Tribune Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304, 1313 (11th Cir. 2001). The district court must then balance one party's interest in obtaining access to the

information against the other's interest in keeping the information confidential. Id.; Farnsworth v. Proctor & Gamble Co., 758 F.2d 1545, 1547 (11th Cir. 1985).

Due to the highly confidential nature of the information the Government seeks, and for the reasons set forth below, there is good cause for entry of the Protective Order Claimants seek.

## B. Good Cause Exists for the Protection of Claimants' Confidential Business Information

The first question that must be addressed in order to find good cause for entry of a protective order is whether the information sought qualifies as a trade secret or commercially sensitive and confidential information. Firestone, 263 F.3d at 1313; Duracell Inc. v. SW Consultants, Inc., 126 F.R.D. 576, 578 (N.D. Ga. 1989).

Commonly accepted criteria defining trade secrets require the party seeking the Protective Order must have consistently treated the information as closely guarded secrets; that the information represents substantial value to the party; that it would be valuable to the party's competitors; and that "it derives its value by virtue of the effort of its creation and lack of dissemination." Firestone, 263 F.3d at 1313-14. Likewise, a party seeking a Protective Order for commercially sensitive and confidential information

12

must establish the information sought to be protected is confidential and its disclosure might be harmful.  Duracell, 126 F.R.D. at 578.

In Duracell Inc. v. SW Consultants, Inc., 126 F.R.D. 576 (N.D. Ga. 1989), the court addressed whether to issue a Protective Order for three categories of information:  marketing information, financial information, and sources of supplies.  Id. at 578.  Regarding marketing information, the court noted that plaintiff in the case had attempted to discover the other party's marketing strategy, present and projected sales, and customer lists.  Id.  The court then stated that "[c]ourts have consistently held that marketing information is confidential commercial information and have afforded it some protection from discovery."  Id. citing American Standard v. Pfizer, Inc., 828 F.2d 734 (Fed. Cir. 1987).

Likewise, the court acknowledged a company's financial information, such as expenditures, organization, financial statements and bank accounts, and sources of financial support, is typically extended protection by Federal Rule of Civil Procedure 26.  Id. at 579.  In fact, the court found that "[a]rmed with this information a competitor could determine the strength or vulnerability of a company's financial condition."  Id.  In addition, the court found that information about past and present suppliers of a company could

be very valuable in that company's industry and might be afforded protection, or at least be subject to limited disclosure. Id. at 580.

In this litigation, the information requested by the Government qualifies as either trade secrets or commercially sensitive information. The Requests for Production call for precisely the type of information that Rule 26(c)(1)(G) was designed to protect. The Government has asked for information that concerns every aspect of how the Claimants structure and run their business, from internal organization to revenue attained and marketing strategies, and additionally seeks very private financial information. Disclosure of the rates that Claimants charge to their clients and the money generated by their websites as well as the financial agents they choose would be incredibly valuable information to competitors in ascertaining the methods that afford Mansef such success. Mansef's websites are among the top in its industry, having been highly successful. To be required to disclose the basics tactics and means it used to acquire that market share absent a Protective Order could be devastating to its business model.

As both Claimants are privately held companies, very little of the information requested is public knowledge, and neither company has chosen

to make this information accessible to the public. The information sought is extremely valuable to both companies, as Mansef, the parent company of Premium, is a highly successful provider of legal online adult entertainment for its customers worldwide. Mansef is such a prodigious company that at one point, it employed several hundred people, including content creators and supervisors, computer engineers and programmers, information technology specialists, search engine optimization technicians, human resources personnel, accounting and financial staff as well as in-house lawyers.

If competitors had access to the business strategies of a major market player such as Mansef, they could easily imitate Mansef's structuring, marketing tactics, and pricing, thereby maximizing their own business profits and efficiency, and thus considerably undercutting Mansef's competitive advantage.

Absent the imposition of the proposed Protective Order, the Government will have the ability to make public this confidential and highly sensitive information in the course of the litigation. That competitors would be interested in Claimants' business information is obvious due to the

success of Mansef, as well as the fact the adult entertainment press has already reported on the Government's seizure of Mansef's funds.

In this case, the balance tips decidedly in favor of Claimants. It is often common for litigants to seek a Protective Order finding they are not required to provide any of the highly sensitive information and documentation being sought. Here, Claimants acknowledge there is a certain, limited amount of financial and corporate information that will have to be divulged in order to sustain their burdens of proof. However, that does not mean Claimants should give up all their rights of privacy. In particular, in this case, Claimants are prepared to make relevant corporate and financial information available under the protection of a Protective Order. Absent the Protective Order, Claimants will be harmed when their closely held information is made publicly available, or if it may be turned over to un-related third parties or non-government employees. The more individuals who have access to confidential proprietary documents, the more likely it is the documents will reach the hands of competitors.

On the other hand, the Government will not be harmed at all by entry of this Protective Order because it will still have access to the information relevant to its case, and will instead only be limited by a Protective Order

16

that restricts unwarranted disclosure of information to individuals unrelated to this lawsuit or legitimate law enforcement purposes.

Furthermore, the Government does not dispute that Claimants' documents are confidential and entitled to protection, the parties have simply been unable to come to agreement as to the extent of the protections afforded by the Order. Given there is no dispute that the documents are confidential and contain proprietary information, the Government cannot reasonably assert that Claimants will not be harmed if their information becomes either public or accessible to parties not involved in this litigation.

The Protective Order proffered by Claimants contains the language of a standard Protective Order used in countless cases. It simply gives the propounding parties on both sides basic assurances that their disclosed information will not be improperly disseminated to individuals outside the context of this litigation or legitimate law enforcement purposes.

Claimants recognize the Government has the right to use information it obtains from them for legitimate law enforcement purposes. At the same time, this Protective Order is designed to ensure that if the Government has a need to share the information and data with non-government personnel, such

as expert witnesses or others, those third parties will also be bound by the provisions of the Protective Order.

## C. Complete Disclosure of Private Customer Information May Expose Claimants to Liability under European Privacy Laws

In addition to the dangers posed by divulging sensitive business information without a Protective Order guaranteeing the confidentiality of that information, complying with some of the Government requests could expose Claimants to liability under European Law. Some of the information sought by the Government involves information about subscribers and users who are located in Europe and are thus protected by the European Data Privacy Directive, which restricts the disclosure of personal data. Disclosure may also violate the privacy laws of several individual European countries and also implicate United States privacy laws. In consequence, Claimants wish to be able to provide any such relevant data in anonymized form, thus minimizing the likelihood of any violation of European or United States privacy rights.

The European Directive, which is implemented and, in some cases enhanced, by the laws of its various members states, prohibits the disclosure or dissemination of "personal data" or information that allows an individual to be identified, without the consent of the individual, absent necessity.

Directive 95/46/EC (30) and Art. 2(a).  Necessity is not defined in the law,

but instead left up to member states of the European Union to determine, and

even if necessity is found, each member state specifies the conditions under

which that information may be disclosed.  Directive 95/46/EC (30).  Some

of the member state laws require any personal data that is disseminated be

"rendered anonymous," or modified so that the information cannot be

attributed to an identifiable individual.  German Federal Data Protection Act,

Sec.s 3, 28(1).

Information such as the identity of Claimants' consumers, their

addresses, and their credit numbers is information that would fall under the

shelter of these European laws.  In responding to document requests from

the Government for information about its revenue streams, Claimants will be

forced to produce records provided by credit card processors who received

funds from European users and subscribers to Mansef's websites.  In some

instances, those processor records identify the user by name and address.

While Claimants appreciate the data about the source of the revenue has

some value to the Government's case, Claimants propose to provide that

documentation by substituting a moniker for each user, such as User 1, User

2, and so on, i.e., anonymizing those details.  This information will remain

useful and relevant to the Government in that the website to which the charge is associated will still be identified, just not the name of the individual user. To do otherwise means that in order to comply with the European Directive, Claimants would first have to obtain the consent of the customers, a proposition which is massive, not likely to be favorably received and wholly unnecessary for the Government to be able to establish its case against Premium. So long as the identity of the website from which the revenue was generated can be determined, the Government should be able to decide whether or not the seized funds were derived from legitimate business enterprises, without having to invade the privacy of Claimants' users, regardless of their geographic location or the local privacy laws which apply

Moreover, it is unclear whether any of the EU member states would consider the discovery propounded by the Government to implicate necessity, a recognized exception. Interestingly, the EU does not require determining any exception to its data privacy laws when the recipient country is considered to have comparable privacy protections. No such comity exists between the U.S. and EU. Further, even if a company is not located in the EU, so long as it is collecting information inside the EU, that

company is still subject to its laws, and violation of those laws could expose Claimants to liability and sanctions.  Directive 95/46/EC (20),(55) and (60).

In consequence, Claimants seek a Protective Order that would allow them to establish the legitimacy of the funds they received, permit them to comply with the Government's discovery requests, and simultaneously protect the privacy of their European and American customers while, at the same time, avoiding possible violations of European law.  This can be accomplished by allowing Claimants to respond to the Government requests by blocking out any information that personally identifies Claimants' customers, and instead employing assigned personal User numbers.

On the balance, anonymizing the information in this way will ensure the rights and protect the interests of both parties to this litigation.  The Government will not by harmed by a Protective Order that sanctions the anonymity of these individuals, while still allowing the Government to ascertain that Claimant funds derived from lawful sources and that any websites Claimants are involved with related to those funds do not contain any inappropriate, i.e., illegal, content.  The Government does not need personal information about Claimants' customers and thus such information is not even relevant to its claims in this case.  In contrast, Claimants and

their customers have a strong and overriding interest in a discovery process that does not violate individual privacy rights.

## V. CONCLUSION

Based on the foregoing, Claimants Mansef Inc. and Premium Services LLC respectfully request this Court to enter its Protective Order affording Claimants, without limitation, the following relief: the entry of the attached proposed Protective Order.                    Respectfully submitted

Dated: July 16, 2010

_/s/ Susan Kohn Ross_
Susan Kohn Ross

Dated: July 16, 2010

_/s/ Mitchell S. Fuerst_
Mitchell S. Fuerst

# DECLARATION OF SUSAN KOHN ROSS

I, SUSAN KOHN ROSS, declare:

1.     I am an attorney at law duly licensed to practice law in the State of California and before this Court.  I am, through my professional corporation, a partner in the law firm of Mitchell Silberberg & Knupp LLP, attorneys of record for Claimant Mansef Inc.  I was admitted before this Honorable Court pro hac vice in January 2010.  I have personal knowledge of the following facts and, if called and sworn as a witness, could and would competently testify thereto.

2.     Attached hereto and marked Exhibit A is a true and correct copy of the version of the Protective Order Claimants propose be entered in this matter.

3.     Discussions about the need for a protective order arose almost from the beginning of this case.  There was a face-to-face conversation about the need for one and its possible terms when the parties appeared before this Court on April 6, 2010.  Those discussions started in March 2010 when Claimants emphasized the need for a protective order in the context of the Special Interrogatory answers which were being prepared.  Government counsel had assured Claimants that a draft would be forthcoming.  On or about March 30, 2010, Claimants provided a proposed Protective Order.  Following the April 6th discussion, there were emails exchanged between counsel in late April and early May about the desire to discuss its terms. Finally, on or about May 7, 2010, the Government provided its own

2794290.1

version of a protective order, completely ignoring the draft Claimants had

provided. Claimants reviewed the Government's proposal and incorporated certain

of its terms in the revised draft which was forwarded on or about June 23, 2010.

When there was still no response in early July, Claimants expressed their

frustration in writing by sending a letter pointing out the extreme lapse of time and

informing the Government that they would file this Motion. Only now that it is

clear the motion is inevitable are Claimants hearing interest on the part of the

Government to discuss possible terms.

4.    Attached hereto and marked Exhibit B is a true and correct copy of

the European Data Privacy Directive, which can be found at

http://ec.europa.eu/justice_home/fsj/privacy/docs/95-46-ce/dir1995-

46_part1_en.pdf and was last viewed July 16, 2010.

I declare under penalty of perjury under the laws of the United States of

America that the foregoing is true and correct.

Executed this 16th day of July 2010, at Los Angeles, California.


_/s/ Susan Kohn Ross_
Susan Kohn Ross

2

## FED. R. CIV. P. 26(c) CERTIFICATION

I hereby certify that Claimants Mansef Inc. and Premium Services, LLC have conferred with Plaintiff repeatedly in good faith and in an effort to solve the parties' discovery disputes without judicial intervention. Claimants first sent a proposed Protective Order to Plaintiff on or about March 30, 2010. Claimants did not receive a response until on or about May 7, 2010, and then only after repeated requests therefor. Claimants provided Plaintiff with a revised version on or about June 23, 2010, conceding to several of Plaintiff's proposed changes, and then Plaintiff responded with another draft, again after repeated requests for a response, on or about July 8, 2010. The parties have unable to come to agreement regarding the Protective Order, leaving Claimants no choice but to file this Motion.

*/s/ Susan Kohn Ross*

1

## L.R. 5.1(D) CERTIFICATION

I hereby certify that Claimants Mansef Inc. and Premium Services, LLC's

Motion for Protective Order and Memorandum of Law in Support of Motion for

Protective Order have been prepared in Times New Roman font, 14 point, pursuant

to L.R. 5.1.

*/s/ Susan Kohn Ross*
_____

1

2794286.1

# CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2010, I electronically filed the

MOTION FOR PROTECTIVE ORDER BY CLAIMANTS MANSEF INC.

AND PREMIUM SERVICES LLC and the MEMORANDUM OF LAW IN

SUPPORT OF MOTION FOR PROTECTIVE ORDER BY CLAIMANTS

MANSEF INC. AND PREMIUM SERVICES LLC with the Clerk of Court

using the CM/ECF system which will automatically send email notification

of such filing to the following attorneys of record:

Special Assistant U.S. Attorney Mary Kruger
U.S. Dept. of Justice
75 Spring Street, S.W., Suite 600
Atlanta Georgia 30303
Mary.kruger@usdoj.gov

Susan Kohn Ross
Mitchell Silberberg + Knupp LLP
11377 W. Olympic Blvd.
Los Angeles, CA 90064-1683
skr@msk.com

Lesli N. Gaither
lgaither@dowlohnes.com
Peter D. Coffman, Esq.
pcoffman@dowlohnes.com
Dow Lohnes PLLC
Six Concourse Parkway
Suite 1800
Atlanta, Georgia 30328

Mitchell S. Fuerst
mfuerst@fuerstlaw.com
Andrew S. Ittleman
aittleman@fuerstlaw.com
Fuerst Ittleman PL
1001 Brickell Bay Drive, Suite 2002
Miami, Florida 33131

*/s/Kyle G.A. Wallace*
Kyle G.A. Wallace
Georgia Bar No. 734167
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Telephone: (404) 881-7000
Facsimile: (404) 881-7777